LAW OFFICES OF JONATHAN G. STEIN
JONATHAN G. STEIN  SBN 224609
5050 LAGUNA BLVD STE 112-325
ELK GROVE CA 95758
(916) 247-6868; (FAX) 443-5022
e-mail jonathan@jonathangstein.com

Attorney for Plaintiff

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARRANCE CHAMPLAIE | CASE NO. 2:2009-cv-01316-LKK-DAD |
| Plaintiff, | PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS BAC HOME LOANS SERVICING, LP, F/K/A COUNTRYWIDE HOME LOANS SERVICING; COUNTYWIDE HOME LOANS, INC,. DBA AMERICA'S WHOLESALE LENDER; RECONTRUST CO; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT AND MOTION TO STRIKE |
| v. | |
| BAC HOME LOANS SERVICING, LP, F/K/A COUNTRYWIDE HOME LOANS SERVICING; COUNTYWIDE HOME LOANS, INC,. DBA AMERICA'S WHOLESALE LENDER; RECONTRUST CO; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; RON ALLEN & ASSOCIATES REAL ESTATE; RONNIE D ALLEN; and DOES 1-20 inclusive, | |
| Defendants. | DATE:     September 28, 2009<br>TIME:      10:00 a.m.<br>CTRM:     4, 15th Floor |

Plaintiff Tarrance Champlaie ("Plaintiff") hereby respectfully requests the Court, pursuant to Federal Rule of Evidence 201, to take judicial notice of the following documents, and the contents thereof, copies of which are attached hereto:

1.   Attached hereto as Exhibit 1 and incorporated herein by this reference is a true and correct copy of correspondence from Defendant Countrywide Home Loans, Inc. dba

1

PLAINTIFF'S RFJN IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKE

America's Wholesale Lender sent to Plaintiff and clearly identifying it as a debt collector.

2. Attached hereto as Exhibit 2 and incorporated herein by this reference is a true and correct copy of an article entitled "The MERS Fifty Million Mortgage Meltdown", by Moe Bedard in Home Loan News dated June 18, 2008.

DATED: September 11, 2009

              Respectfully submitted

              /s/ Jonathan G. Stein
              JONATHAN G. STEIN
              Attorney for Plaintiff
              Tarrance Champlaie

PLAINTIFF'S RFJN IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKE

PROOF OF SERVICE

STATE OF CALIFORNIA )
                    )ss.
COUNTY OF SACRAMENTO )

   I am a citizen of the United States and a resident of the County of Sacramento. I am over the age of 18 years and not a party to the within above-entitled action; my business address is 2882 PROSPECT PARK DRIVE, STE. 350, RANCH CORDOVA, CA 95670.

   On this date I served the foregoing document described as follows:

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' BAC HOME LOANS SERVICING, LP, F/K/A COUNTRYWIDE HOME LOANS SERVICING; COUNTYWIDE HOME LOANS, INC,. DBA AMERICA'S WHOLESALE LENDER; RECONTRUST CO; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT AND MOTION TO STRIKE**

on the following interested parties in this action:

SEE ATTACHED SERVICE LIST

   The following is the procedure in which service of this document was effected:

☐   Facsimile, Time: _____ P.M.; Date:

☐   Federal Express, Priority Overnight

☐   United Parcel Service, Next Day Air

☐   United States Mail,

✓   By Electronic Mail - I hereby certify that I electronically transmitted the attached document(s) to the Clerk's Office using the CM/ECF System for filing and transmittal of Notice of Electronic Filing to the above listed CM/ECF registrants.

   I declare under penalty of perjury that the foregoing is true and correct under the laws of the State of California and that this declaration was executed on September 11, 2009 at Sacramento, California.

/s/ Letitia Brazier
LETITIA A. BRAZIER

PLAINTIFF'S RFJN IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKE

SERVICE LIST

| | |
|---|---|
| Jonathan W. Garlough<br>Foley & Lardner LLP<br>321 N. Clark Street, Suite 2800<br>Chicago, IL 60654<br>312-832-4500-5702<br>312-832-4700 (fax)<br>jgarlough@foley.com | Federal National Mortgage Association<br>TERMINATED: 07/30/2009<br>(Defendant) |
| William J. McKenna, PHV<br>Foley and Lardner, LLP<br>321 North Clark Street<br>Suite 2800<br>Chicago, IL 60654<br>312-832-4500<br>312-832-4700 (fax)<br>wmckenna@foley.com | Federal National Mortgage Association<br>TERMINATED: 07/30/2009<br>(Defendant) |
| Jill L. Murch<br>Foley & Lardner LLP<br>321 N. Clark Street, Suite 2800<br>Chicago, IL 60654<br>312-832-4500-4522<br>312-832-4700 (fax)<br>jmurch@foley.com | Federal National Mortgage Association<br>TERMINATED: 07/30/2009<br>(Defendant) |
| Eileen R. Ridley<br>Foley & Lardner LLP<br>One Maritime Plaza<br>Sixth Floor<br>San Francisco, CA 94111<br>415-438-6469<br>eridley@foley.com | Federal National Mortgage Association<br>TERMINATED: 07/30/2009<br>(Defendant) |
| Bill James Symes<br>Foley & Lardner, LLP<br>One Maritime Plaza<br>6th Floor<br>San Francisco, CA 94111<br>415-984-9860<br>415-434-4507 (fax)<br>bsymes@foley.com | Federal National Mortgage Association<br>TERMINATED: 07/30/2009<br>(Defendant) |
| David Nathan de Ruig<br>Bryan Cave LLP<br>2 Embarcadero Center<br>Suite 1410<br>San Francisco, CA 94111<br>415-675-3409<br>415-675-3434 (fax)<br>david.deruig@bryancave.com | BAC Home Loans Servicing, LP<br>(Defendant)<br>Countrywide Home Loans Inc<br>(Defendant)<br>Mortgage Electronic Registration Systems, Inc.<br>(Defendant)<br>Recontrust Company<br>(Defendant) |

PLAINTIFF'S RFJN IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKE

"EXHIBIT 1"



Countrywide
HOME LOANS

Customer Service
P.O. Box 5170
Simi Valley, CA 93062-5170

Statement date 02/26/2009
Account Number 176605945
Property address
4638 Medina Way

## FOR INFORMATION PURPOSES



0 3 1 4 1 8 6  01 AT 0.346  **AUTO  T1 0 6295 95816-2968
MSR CZ AG 0301-----0--2--- C0000067 IN 4 P14503
TARRANCE CHAMPLAIE
PO Box 162968
Sacramento CA 95816-2968

### IMPORTANT NOTICE

If you do not want us to send your monthly statements in the future, please contact us at **1-800-669-5224**.

This statement is being furnished for informational purposes only and should not be construed as an attempt to collect against you personally. While your obligation to Countrywide may be discharged by operation of law, Countrywide has retained the ability to enforce its rights against the property securing this loan should there be a default.

If you are presently involved in a Chapter 13 proceeding, please be advised that you are required to obey all orders of the Court, including those confirming or modifying the terms of your repayment plan. You may disregard the payment information/coupon below to the extent it conflicts with any order or requirement of the Court.

Your loan documents provide that if we do not receive your current home loan payment by 03/16/2009, your loan may be assessed a late charge of $92.99.

This is not a statement of the amount necessary to pay off your loan.

| HOME LOAN SUMMARY | Principal balance as of 02/26/2009 | $256,145.80 |
|---|---|---|

Calls may be monitored or recorded to ensure quality service.
We may charge you a fee for any payment returned or rejected by your financial institution, subject to applicable law.

**Countrywide is required by law to inform you that this communication is from a debt collector.**

Account number  176605945   (3)
Tarrance Champlaie
4638 Medina Way
North Highlands, CA 95660

03/01/2009        $2,979.37
Please update e-mail information on the reverse side of this coupon.

**HOW TO MAKE A PAYMENT**
1. Please
   - don't send cash
   - don't staple the check to the payment coupon
   - don't include correspondence
2. Write the account number on the check or money order.
3. Make the check payable to
   **Countrywide Home Loans**
   Attn: Remittance Processing
   PO BOX 10219
   VAN NUYS CA 91410-0219

SEE OTHER SIDE FOR IMPORTANT INFORMATION        6295

Additional Principal

Additional Escrow

Other

Check total

Countrywide
PO BOX 10219
VAN NUYS CA 91410-0219

17660594530000029793700030 7236

"EXHIBIT 2"

# The Mers Fifty Million Mortgage Meltdown

Posted by Moe Bedard in Home Loan News on 06-18-2008

*By LoanWorkout.org Reader Kevin Lamson*

## PART I.

## The Promissory Note Evidence Ownership of Debt and Standing to Bring Suit

### The Fundamentals

In the period beginning in 1999 and ending in March of 2008, Mortgage Electronic Registration Systems Inc., a/k/a/ MERS, has been named as a "mortgagee" on over fifty million mortgages. Yet MERS has never originated a single mortgage loan nor loaned a dime to a single borrower. In 2001 the New York Supreme Court ordered the Suffolk County Clerk to accept MERS mortgages for recording as a purely ministerial duty. However, the Court denied MERS' request for a judgment declaring that MERS mortgages were "lawful in all respects".

The New York Court of Appeals affirmed the Supreme Court's order directing the County Clerk to record MERS mortgages. The Court of Appeals did not reverse the Supreme Court's denial of MERS' request for a judicial declaration that MERS mortgages are "lawful in all respects". MERS, for obvious reasons, did not want a published opinion the fact that MERS mortgages are legal nullities and/or that MERS has no standing to enforce a mortgage when it is not a creditor entitled to collect a debt. The New York Court of Appeals did address and frame these two issues but left them to be decided at a future date.

### No Note No Foreclosure

In reality, MERS is really nothing more than a shell, or a front corporation for its so-called "members". Many of these MERS members were once some of the most prestigious names in American finance. Many MERS members are now reporting hundreds of billions of dollars of losses as result of their ill conceived scheme to ramp up mortgage origination so they could pretend to flip millions of mortgage loans into trusts in exchange for trillions of dollars of investors' money. One big problem was that the promissory notes were never actually delivered to the trustees of these trusts. Therefore, these trusts have no evidence of ownership of the debts they purportedly purchased akin to purchasing a home without being given a deed. To make matters worse many of the debts evidenced by these undelivered promissory

notes were supposed to be secured by mortgage liens. However, in place of mortgages being executed in favor of the original lender many of these mortgages were executed in favor of MERS. Because MERS never holds these notes or owns a debt it is not a creditor. MERS has no legal standing to enforce a debt, or so it told the Nebraska Court of Appeals in 2005. However, this lack of standing defense must be raised by property owners who are sued.

The most effective economic way to raise this lack of standing defense is by bringing a motion to dismiss in response to the complaint to foreclose. In many states and in federal court this is called a Rule 12 motion. This motion is brought in place of answering the complaint. An honest attorney in most areas of the country should be willing to prepare and bring such a motion for $500.00 to $1,500.00 for a distressed homeowner. Or you might be able to find a lawyer to do it for you pro bono and perhaps a legal aid attorney. At least five judges around the country have dismissed these actions for lack of standing sua sponte, which means they did it on their own volition. Perhaps more judges will feel the duty to do the same thing in the future to protect the integrity of the Court.

MERS members, mortgage industry executives, invented the so-called MERS paperless system to short cut standing mortgage lending safe guards and d circumvent the legal requirements for originating mortgage loans and/or for selling and transferring these loans to subsequent holders. This would allow MERS members like Countrywide Financial, Fieldstone Mortgage, and Option One Mortgage to make loans to anyone with a heartbeat and then quickly flip these questionable loans to other MERS members such a FannieMae, Freddie Mac, Bear Stearns, Merrill Lynch, Lehman Brothers to name just a few. ("Secondary Mortgage Market Players")

These Secondary Mortgage Market Players would claim to package millions of these loans, with or without being delivered the promissory notes, into loan pools or "mortgage backed security trusts" and then flip the loans by selling trillions of dollars of bonds to investors around the world. The bonds were touted by Secondary Mortgage Market Players as producing safe yet high returns. The investors who bought these bonds included many of the world's largest national banks. Initially MERS members reported windfall profits year after year by quickly originating, packaging into pools and then flipping trillions of dollars of mortgages loans to investors.

MERS members, such as title insurance companies, also took their cut from each of the fifty million loans that were made while this high speed gravy train was rolling. MERS itself would earn over a billion dollars a year by charging its members $250.00 for each mortgage that MERS would be named as "mortgagee".

A June 10, 2007 article in Forbes magazine details the carelessness in the securitization process by which mortgage loans were packaged and sold off to mortgage pools is now coming back to bite the trustees of these mortgage backed trusts who are now seeking to foreclose millions of loans that are in default:

The financial engineering (i.e. mortgage securitization) helped oil the housing boom by making credit more available. But stalled housing prices and rising defaults have revealed a mess: In the rush to flip paper, lots of the new lenders or pools don't have the proper paperwork to show they even hold the mortgage.

The reported profits from the sale of these mortgaged backed securities would result in billions of dollars of salaries and bonuses being paid to the senior executives of many of MERS member corporations. Ultimately the bond investors who actually provided all the money would learn that their "safe" investment was anything but safe. As hundreds thousands and then millions of these loans fell into default. These bondholders would lose hundreds of billions of dollars. As of April 1, 2008, the largest banks around the world had already written off loses of one hundred and fifty billion dollars relating to bonds they had purchased. One Swiss bank, U.S.B., has recently reported 40 billion dollars in losses.

These loses may only be the beginning. What many people refuse to admit is that because of the so-called MERS paperless "system" many of the so-called mortgage backed security trusts do not actually hold the promissory notes which evidence the debts that are supposed to be backing the bonds purchased by these investors. The situation is reminiscent of the great Great Olive Oil Scandal in the late 1800's when banks were duped into investing millions of dollars into Olive Oil only to later discover that the tanks which were supposed to be holding millions of gallons of olive oil backing their investments were mostly empty.

This problem with the missing trust assets/promissory notes manifests itself each time MERS and/or the trustees for the bondholders brings a legal action to collect on a debt through foreclosure. Because neither MERS nor the bond holders' trustees are holding the notes they lack proof of standing to

maintain their legal actions and the actions are subject to dismissal. Many foreclosure actions have been dismissed based upon lack of standing. This is a problem that is a direct result of MERS "system".

It appears that after MERS mortgage loans are flipped to the mortgage backed trusts the promissory notes are not actually delivered to the trustees. Nor are assignments of mortgages executed and delivered which evidence the fact the original lender has transferred the debt which is secured by the mortgage. This leaves the trusts with absolutely no paper evidence of ownership of the secured debt it purportedly owns. One informed lawyer who represents homeowners in Florida, April Charney, had foreclosure proceedings against 300 clients dismissed or postponed in 2007 for lack of standing. She is quoted as saying that "80 percent of them involved lost-note affidavits". . .

They raise the issue of whether the trusts own the loans at all," Charney said. "Lost-note affidavits are pattern and practice in the industry. They are not exceptions. They are the rule." Ms. Charney, started challenging MERS and it members lost note affidavits after becoming skeptical of the lender could possibly lose hundreds of promissory notes.

At least two Florida judges shared Ms. Charney's skepticism regarding the copious amounts of MERS lost note affidavits and they issued show cause orders, sua sponte, challenging MERS to show proof that it held and/or lost notes in numerous actions. After evidentiary hearings these two alert judges dismissed twenty nine (29) MERS actions to foreclose for lack of standing. One judge struck MERS pleadings as being sham. A South Carolina court dismissed a MERS action to foreclose for lack of standing even though MERS filed an affidavit wherein a person claiming to be an officer of MERS claimed that MERS was holding a promissory note. The South Carolina court vetted the MERS affidavit claim that it was the holder of the note after being apprised of the fact that MERS had previously told the Nebraska Court of Appeals that it never held promissory notes.

In late 2007 three Federal Court Judges in Ohio dismissed over fifty law suits brought by trustees of mortgage backed trusts where they could not produce the original promissory notes. Following these decisions the Bankruptcy Court in Los Angeles, California adopted a rule of practice which requires all foreclosing trustees or other plaintiffs to produce the original promissory note when bring an action to foreclose a debt or face sanctions for not doing so. Several courts in New York have been routinely dismissing foreclosure actions brought by MERS or its members because they continually fail to produce promissory notes.

It is disturbing to know that National Banks are the trustees of thousands of trusts that may be missing millions of promissory notes. This might explain why, to date, not a single National Bank has publicly disclosed the fact that they are not actually holding what may be millions of promissory notes which evidence ownership of debts supposedly owned by their respective trusts. An independent audit of these trusts would probably be quite revealing. This writer is also unaware of any such audits that have been performed to date. These National Bank's, as trustees, are accountable and therefore liable for missing trust property or the documents evidencing ownership.

As more borrowers, lawyers and judges learn that neither MERS nor these trustees are actually holding the promissory notes evidencing the debts they seek to collect through foreclosure, dismissals of these foreclosure actions for lack of standing will become routine. As it now has in New York, Ohio and Florida. This will also mean that bondholders from around the globe will be seeking to recover their losses from the National Bank trustees who never got around to obtaining the notes evidencing debts that were purportedly owned by these trusts.

<u>A Review of problems with basic MERS paperless system</u>
The members of MERS had, from the onset, three serious problems which would ultimately derail their high speed and high volume mortgage lending system. The first problem was finding millions of Americans who could qualify for a loan to purchase any home. The second problem was how to quickly endorse and deliver of millions of promissory notes from the originating lender to Secondary Market Players and then on to subsequent holders, like the trusts. The third problem was executing millions of assignments of mortgages and recording these assignments in the public land records, which each successive transfer of the promissory notes. The last two would require significant administrative time and expense. MERS and its members didn't want to be bogged down by trivial administrative details. They wanted to make big money fast by making millions of loans with other people's money and making those loans at lightning speed. Their attitude was "Damn the torpedoes -- full speed ahead".

Rather than finding people who could actually qualify for loans, meaning pay it back. MERS members simply lowered the qualification bar by creating all kinds of "creative loans", including two which they called "No Doc" and "Sub Prime loans". No Doc (no documentation) loans would be made to borrowers who had good credit scores but would not require verification of actual income of the borrowers, sometimes relying on income as stated by the borrower, and sometimes putting in fictional numbers. These loans would later become known as liar loans. Sub Prime loans would be made to

borrowers who had less than stellar credit history or no credit history. Many people from minority groups and newly arrived immigrants became targets for these loans. Both No Doc and Sub Prime loans carried higher interest rates than regular mortgage loans. By lowering home loan qualification bar these greedy geniuses had invented a larger market of residential home purchasers.

Swarms of previously unqualified borrowers could now be swooned by real estate agents, mortgage brokers into buying a house by borrowing money, not from a bank or savings and loan, but from investors who were at two times removed from the closing table. This expanded market of previously unqualified home buyers and/or investors created a real estate bonanza on the street level for realtors, mortgage brokers, and home builders. Prices for homes rose dramatically as this new demand by buyers who really were not qualified out-stripped the supply of homes. The high foreclosure rates in the Las Vegas, Miami, California and rust belt areas as no relationship to geography. But clear relationships with the ease of No Doc and Sub Prime loan acceptance.

Rather than actually delivering millions of endorsed promissory notes to the Secondary Market Makers and then on to the bondholder's trusts, which is the only way a debt evidenced by a negotiable instrument is legally transferred to a new owner, the promissory notes were either not delivered at all, or were simply delivered to the original loan servicer, weeks and/or months, after the originating lender had sold the debt. Thus in many cases the "mortgage backed security" trusts may not actually be holding millions of promissory notes which evidences the ownership of the debt that these mortgage backed loan pools supposedly own or hold. To make matters worse many of the original mortgage lenders and large loan servicing companies have filed for bankruptcy of just gown out of business. Decreasing the trusts likelihood of ever locating much less obtaining possession of what could be hundreds of thousand if not millions of missing promissory notes.

Rather than actually delivering bona fide (real) assignments of each mortgage to the Secondary Mortgage Makers and then causing each mortgagee's interest to be re-assigned to each mortgage backed investment pool, along the high speed mortgage gravy train route. The simply invented the MERS "paperless" system. The founders of MERS knew that MERS was merely a "a facade" they would employ to expedite the number of loans that could be originated, packaged and sold as mortgage backed securities. They felt they could "eliminate" such paperwork as promissory notes and mortgage assignments even though commercial law requires such sundry items as promissory notes and mortgage assignments. The MERS founders

seem to think they could ignore and/or circumvent the law as if the "the ends justified the means" as long as they would make big money.

Rather than record millions of mortgages and multiple millions of assignments in local land records the founders of MERS decided that it would be named the "Mortgagee" in place of the original lender. By creating (inventing) this new entity, MERS declared that it was some sort of agent for each and every mortgagee or mortgagee assignee and could then act as a "mortgagee" in the public land records. Through this clever legal sight of hand MERS founders believed they could eliminate the commercial lending practices of having to endorse and deliver each promissory note to the new owner/holder and eliminate the execution of each assignment of mortgage by the mortgage lender for each secured note that was sold to a Secondary Market Maker, together with incidental recording of each assignment of mortgage by the Secondary Mortgage Maker or its assigns.

MERS founders and members went about foisting their so-called "paperless" system on the American economy and indirectly upon the global economy. MERS studiously avoided seeking any legislative changes of long standing commercial laws relating to promissory notes, mortgages and public recording of assignments in any of the 50 states that it would ultimately be operating. It is possible that this blatant abuse, of the UCC and state recording laws might have passed itself off as the new way of doing business in our computer age. But MERS member companies, under clear instructions from their leaders, guaranteed disaster by pumping up and them dumping these shaky loans onto investors through trust they set up for this purpose. These investor/bondholders are just now discovering that they were duped. They just don't know how badly they were duped.

Perhaps this is what thé global economy is really all about. Seeing who can dupe international banks and governments out of trillions of dollars depositor and taxpayer money and do so with complete impunity. Yet, to my knowledge, after learning that they invested trillions of dollars into these questionable loan pools n/k/a/ cesspools, not a single National Bank has ordered an audit of these cesspools or trusts to determine the actual contents and the value.

As a matter of sound public policy our courts should not allow MERS or its so-called "members" to circumvent and/or violate long standing laws of commerce, simply because some greedy mortgage executives thought they could shoe-horn their so-called "paperless system" into the framework of our current system of commerce. Our system still requires such sundry instruments as promissory notes be used to evidence debts and also

requires that these instruments change hands when sold or transferred to a new owner.

Our system also requires a new holder of a promissory note to record an assignment of security interest or mortgage in order to enforce a lien which secures the debt evidenced by the promissory note. No one should be able to simply ignore these long standing laws just so they can reap billions of dollars in illicit bonuses by quickly originating and then flipping loans without the attendant delivery of notes and assignments of mortgages. Our system of commerce does not operate this way. This is because we have laws of commerce including the UCC which regulates our system of commerce. The MERS paperless system simply provided an expedient way for MERS and its members to fleece investors on a global basis, by loaning money to people who couldn't or wouldn't pay the money back and then flipping trillions of dollars of these bogus loans to third party investors. The MERS system does not comply with our current laws of commerce. While the computer age has admittedly changed how business is transacted it has not eliminated or replaced the legal requirement for such things as promissory notes, mortgages and assignments of mortgages, when a loan is made, a mortgage given and the loan is subsequently sold and/or resold.

This is precisely why a competent and prudent lender who makes a loan to a qualified borrower takes back a promissory note and if the loan is to be secured the borrower executed a mortgage or security agreement naming the lender as the mortgagee or secured party. The lender must then record or file its mortgage or security agreement to prefect its lien. If the lender decides to sell the debt it is owed to a third party it must endorse and deliver the promissory note to the third party. And in order for the third party to enforce either a mortgage lien or security interest the original lender must execute an assignment of mortgage or security interest which must then be recorded or filed by the third party to give evidence and public notice of its status as assignee of the lien securing the debt it had purchased. Only the holder of the promissory note is entitled to enforce the note and/or any lien which secured the debt.

Given the extremely close relationship that MERS and its many corporate members have with the politicians who run our state and federal governments, it is not surprising that MERS and its members were able to pull off this gigantic global financial scheme without raising the brow of a State or Federal law enforcement or regulators. Only now are a few politicians and regulators paying lip service to what they refer to as the "Mortgage Meltdown".

What no politician or regulator ever seems to mention is that a millions of the mortgages that "melted down" have the name Mortgage Electronic Registration System Inc. on them. American courts should no longer tolerate or close a blind eye to the fact that the MERS has no standing to commence any legal actions relating to peoples properties because they do not hold any legal or equitable interest in the debt or in the properties.

The Courts must protect the integrity of our court system by enforcing our laws of commerce as they have existed and not allow parties to come into our courts and commence actions relating to debts that they do not own and/or have no proof of ownership.

This writer has been investor in real estate since 1976, and has owned properties in eight states and three countries. Over the last thirty two years I have witnessed and heard of many illegal or fraudulent schemes involving real estate finance.

The MERS "paperless system" is the kind of scheme that is hatched in some internet boiler room in Nigeria, not in the boardrooms of our once prestigious American financial institutions. This gigantic scheme completely ignored long standing law of commerce. The effect of the system has already had a catastrophic effects on both the American and global economy.

Yet many of the investment "trusts" which supposedly hold thousands of original promissory notes are hard pressed to produce them when legally required to do so. MERS admittedly does not hold any promissory notes. A party must have possession of a promissory note in order to have standing to enforce and/or otherwise collect a debt that is owed to another party. Given these facts how will these investors ever recoup their investments if the debt they were supposed to own cannot be legally enforce or collected? What will be the status of title to properties that were purportedly foreclosed by MERS where MERS admittedly had no legal right to foreclose or otherwise collect debt which are evidenced by promissory notes held by someone else?